[No. 35209. Department One. March 24, 1960.]

WINIFRED HUGHES *et al., Appellants,* v. E. B. GIBBS *et al., Respondents.*[1]

*Wellman Clark,* for appellants.

*Delbert R. Scoles* and *Ek & McNally,* for respondents.

[1]Reported in 350 P. (2d) 475.

HUNTER, J.—This is an appeal from a judgment of dismissal in an action brought by the plaintiffs as third-party creditor beneficiaries of a contract between the defendants, E. B. Gibbs and Grace C. Gibbs, his wife, and the Chewelah Copper Company, a Washington corporation.

The plaintiffs, Winifred Hughes and Dora Dickey, own certain mining claims in Stevens county, Washington. On November 17, 1953, they entered into a lease agreement with the Chewelah Copper Company. The lease provided, among other things, that the lessee corporation

" . . . shall cause to be performed a minimum of 312 eight-hour man shifts of labor per year, or in lieu thereof, shall pay OWNERS the sum of Two Thousand Dollars ($2,000.00) per year."

The Copper Company during 1954 and 1955 entered into a number of conditional sales agreements with the defendants. The company became delinquent in certain payments due under the conditional sales agreements, and in addition had become indebted for other operating expenses. In order to insure payment of its obligations and to revitalize its mining operations, the Copper Company entered into an agreement with the defendants on April 27 ,1955. The agreement, entitled an "operating agreement," stated that it was the company's desire to employ the defendants to take over the development and operation of the company's mining properties. Pursuant to this objective, the agreement gave the defendants complete control over the mining operations. All operating costs were to be paid from the proceeds of the mining activities, and defendants were to be reimbursed for all advances made prior to receiving the proceeds from the sale of ore.

The Copper Company made the two thousand dollar in lieu payment to the plaintiffs for the period ending November 17, 1954. However, for the three yearly periods from November 17, 1955 through November 17, 1957, no work was performed on the plaintiffs' claims, nor were any payments made in lieu thereof. The plaintiffs made demands upon the Copper Company and included the defendants. Since there was no response to the demands, the plaintiffs

commenced two separate actions against the Copper Company for the payments due. On February 7, 1956, the plaintiffs obtained a judgment against the Copper Company in the sum of two thousand dollars, the amount due for the period ending November 17, 1955. On July 10, 1957, they obtained a similar judgment against the Copper Company for the amount due for the period ending November 17, 1956.

In December 1956, controversies arose between the defendants and the Copper Company; as a consequence, it was mutually agreed that the defendants would cease operating the mining properties and, on May 17, 1957, the parties terminated the operating agreement by an instrument in writing.

Subsequent to this cancellation, on November 22, 1957, the plaintiffs commenced this action against the defendants to recover six thousand dollars, the amount of the in lieu payments unpaid at the commencement of the action. Trial to the court resulted in a judgment of dismissal, whereupon the plaintiffs appealed to this court.

Assuming without deciding that, as appellants contend, they were third-party creditor beneficiaries of the operating agreement, we need only decide whether the respondents and the Chewelah Copper Company could terminate the operating agreement without the consent of the appellants.

The applicable rule is set forth in 12 Am. Jur. 844, § 291:

"After the third person accepts, adopts, or acts upon the contract entered into for his benefit, the parties thereto cannot rescind the same without his consent so as to deprive him of his rights thereunder. . . ."

See, also, 53 A. L. R. 178; 81 A. L. R. 1292; 5 Williston on Contracts 4065, § 1455A; and *Huston v. Washington Wood & Coal Co.*, 4 Wn. (2d) 449, 103 P. (2d) 1095 (1940).

Accepting, adopting, or acting upon an agreement is predicated upon the third person having knowledge of the terms and conditions of the agreement and not merely knowledge of its existence, and such knowledge must be

established by the third party claiming the benefit of such agreement. In the instant case, the trial court made the following findings of fact:

"That plaintiffs had no definite knowledge of the terms of the operating agreement until the date of the trial and had no information as to the obligations of the Defendants thereunder, other than the fact that they knew Defendants were operating the property. Plaintiffs caused certain letters to be sent to the Defendants in 1955 stating that the amount due under the terms of the lease was delinquent, and was informed by Mr. Gibbs that he had assumed no obligation therefor. Subsequently the Plaintiffs obtained the two judgments against Chewelah Copper Company hereinbefore referred to, and the Defendants were not made parties to those actions.

"That the Plaintiffs did not accept, adopt or act upon the terms of the Operating Agreement prior to the commencement of this action, nor prior to the termination of said Operating Agreement on May 17, 1957."

 It is clear that if these findings are supported by substantial evidence in the record, the consent of the appellants was not necessary for a termination of the operating agreement. An examination of appellant Hughes' testimony is inconclusive of appellants' contention that she knew the terms of the agreement.

The record also contains certain letters upon which the appellants rely. The first of these, dated May 20, 1955, was written by the appellants' counsel to the respondent E. B. Gibbs:

"Dear Mr. Gibbs:

"I am representing Mrs. Dora Dickey and Mrs. Winifred Hughes, who are the owners of the following claims:

". . .

which are held by virtue of a lease by the Chewelah Copper Company. The terms of this agreement provide that $2,000 be paid in lieu of labor for the year 1954. Of this sum, only $750.00 have been paid.

"My clients have been repeatedly promised by the Chewelah Copper Company that the balance would be paid but to date, they have failed to do the same.

"They have requested that I write you advising you of the condition and they have instructed me that unless the

amount is paid by the end of this month that I should take necessary legal steps to collect the balance. . . ."

On May 25, 1955, respondents replied through their attorney:

" . . .

"Mr Gibbs has taken over the operation of the Chewelah Copper Company property, *but did not assume the obligation mentioned in your letter.* However, he does not wish to have the property involved in any way, and has asked me to take the matter up with the officers of the Chewelah Copper Co. I will do this as soon as possible, and do what I can to see that payment of this obligation is made.

"I request that you advise me before taking any further action that will affect the property involved in the lease. . . ." (Italics ours.)

There is no evidence of any further correspondence between the parties until December 2, 1955, when appellants' counsel wrote to respondent E. B. Gibbs as follows:

" . . .

"*I do not know the terms of your agreement with the Chewelah Copper Company* and I am including you at this time in a demand I am now making on behalf of my clients for the payment of the aforesaid sum of $2,000. . . ." (Italics ours.)

Given their most liberal interpretation the letters indicate no more than the fact that the appellants knew respondent was the operating agent of the company and was authorized to pay expenses incurred in the operation of the mining properties. The language contained in the foregoing letters cannot reasonably be construed as evidence that the appellants or their attorney had knowledge of any provision in the agreement making the respondent personally liable for the in lieu payment of two thousand dollars each year, under appellants' lease with the Copper Company.

Moreover, the record shows that subsequent to this correspondence and during the existence of the operating agreement, the appellants commenced two actions to recover delinquent payments; in both actions they named only the Copper Company as party defendant. They chose not to join the respondents in spite of the fact that the agreement

disclosed the precarious financial position of the Copper Company, and that the respondents as conditional vendors had title to much of the expensive equipment employed in the mining operations. Thus, it is clear the acts of the appellants were inconsistent with their having any knowledge of the *terms* of the operating agreement.

We are satisfied the findings of the trial court are supported by substantial evidence in the record, and that the trial court correctly concluded that any rights appellants may have had under the operating agreement were terminated by the agreement of May 17, 1957.

■ Finally, appellants contend the agreement of May 17, 1957 was not admissible because, if construed as a release, it constituted a matter of affirmative defense but was not so pleaded. This contention is without merit since the canceling agreement was admitted without objection and was therefore properly before the court for all purposes.

The judgment of the trial court is affirmed.

WEAVER, C. J., MALLERY, DONWORTH, and OTT, JJ., concur.